UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Nicole Brodeur, et al.

    v.                              Civil No. 07-cv-206-JL
                                          Opinion No. 2009 DNH 082

Claremont School District et al.

## O R D E R

Elaine and William Brodeur, and their daughter, Nicole, have sued the Claremont School District, the principal of its high school, and a former teacher there, alleging violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and a number of state law causes of action arising out of certain offensive comments the teacher made to Nicole, and their aftermath.  The defendants have moved for summary judgment on all of the plaintiffs' claims.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction). After hearing oral argument, and for the following reasons, the defendants' motions for summary judgment are granted in part and denied in part.

## I.   **Applicable legal standard**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  In making this determination, the "court
must scrutinize the record in the light most flattering to the
party opposing the motion, indulging all reasonable inferences in
that party's favor."  Mulvihill v. Top-Flite Golf Co., 335 F.3d
15, 19 (1st Cir. 2003).

       To comprise part of the record on summary judgment, however,
proffered testimony "must be made on personal knowledge, set out
matters that would be admissible in evidence, and show that the
affiant is competent to testify on the matters stated."  Fed. R.
Civ. P. 56(e)(1).  The defendants, in their reply memorandum,
protest that some of the testimony relied on by the plaintiffs in
opposing summary judgment runs afoul of this rule, because it is
hearsay.  Specifically, the defendants object to the Brodeurs'
testimony relating what others, including Nicole and one of her
classmates, told them; testimony by Nicole's English teacher
relating what others told him about Grumman's behavior; and an
unauthenticated record from a counselor who treated Nicole.

       "It is black-letter law that hearsay evidence cannot be
considered on summary judgment."  Davila v. Corporación De P.R.
Para La Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007).  Much
of the evidence to which the defendants object appears to be
hearsay, i.e., out-of-court statements offered to prove the truth
of the matters asserted, that does not readily fit within any of

2

the recognized exceptions.  And the plaintiffs have not carried
their burden to show that any of those exceptions apply, <u>see
United States v. Gaines</u>, 170 F.3d 72, 79 (1st Cir. 1999), or,
indeed, made any response at all to the defendants' objections.
In ruling on summary judgment, then, the court has not considered
the hearsay statements proffered by the plaintiffs and
specifically challenged as hearsay by the defendants.  <u>See</u> <u>Perez
v. Volvo Car Corp.</u>, 247 F.3d 303, 314-15 (1st Cir. 2001).


**II.  <u>Background</u>**

**A.  The harassing remarks**

        At the start of Nicole's sophomore year at Stevens High
School in Claremont, when she was 15 years old, defendant Gene
Grumman was her biology teacher.  Grumman, himself 55 years old
at the time, had been teaching at Stevens for the past 25 years.
The biology course lasted one semester, from September 2005 until
mid-January 2006.  Within the first two months of the school
year, Grumman made several remarks about Nicole's buttocks.
Nicole described these remarks as "weird statements" or "sick
comments," about five or six in all.

        In one, Grumman was explaining the concept of the genetic
code through an analogy in which Nicole was in love with a boy in
the class, but had been locked in her room by her parents as
punishment for seeing him.  Grumman asked the class to suggest

3

ways that Nicole could still communicate with the boy, leading one student to suggest that she climb out the window. Grumman said in response, according to Nicole's contemporaneous account, "with that huge rubus of hers and those hips there's no way she would fit. And then . . . she would be so grounded that her parents wouldn't feed her dinner, but maybe that would help."[1]

On another occasion, Grumman, in Nicole's words, "talked about my--my butt and how if I was walking down the hallway that I would knock out all of the lockers because it was so big." As a result, Nicole recalled, "everyone used to look at me when I was walking down the hallway because he pointed that out." Grumman himself remembered a different incident where he asked a boy in the class to draw a circle on the chalkboard to represent a cell, but the boy drew the circle too small. So Grumman told him, "You have to make it bigger. Make it as big as Nicole's butt."[2] The boy drew a circle of "exaggerated" size in response, eliciting laughter from some of the other boys in the class.

---

[1] In the literal sense, the word "rubus" refers to a genus of wild berry; it appears, based on Nicole's subsequent deposition testimony, that she meant "rumpus," which she took to mean "buttocks." Grumman, for his part, denied having referred to the buttocks at all, though he admitted referring to the hips.

[2] There is evidence that Grumman actually directed this comment at a different girl in the class. Taking the evidence in the light most favorable to the plaintiffs, however, the court must assume that, like Grumman testified, the comment was directed at Nicole.

In yet another incident, Nicole arrived for class wearing pants with one of the nicknames for the school's athletic teams, "Big Red," emblazoned across the bottom.[3]  Pointing at the pants, Grumman said, "Oh, that's what you call it these days," which Nicole understood to refer to the size of her buttocks.  Grumman made a similar comment to another girl in the class who was wearing pants with that design, Caitlin Oullette, telling her, "I called you many things but 'Big Red' is definitely a new one" (spelling corrected).

During the same time period, in fact, Grumman made other like comments about Caitlin as well, about five or six in total, according to Nicole.  Once, Grumman told the class that a person kills 1,000 "butt cells" just by sitting down, but--pointing to Caitlin--"Big Red over here must kill about 2,000 every time she sits down."  Yet another time, after a boy in the class showed Grumman a sticker and asked him, "Isn't that sexy?" Grumman pointed to Caitlin "in front of the whole class" and said, "I think that's sexy but the sticker isn't" (spelling and punctuation corrected).  The summary judgment record contains evidence, either direct or circumstantial, that Nicole witnessed

---

[3]Of course, as any fan of N.H.I.A.A. Class M-S athletics knows, the Stevens teams are officially known as the Cardinals.

all of these incidents.[4]  Grumman did not make such comments
about any of the boys in the class.

## B.   Nicole's complaint and the school's response

By roughly the middle of October, Nicole told her parents
about Grumman's comments.  Her parents, in turn, told her to tell
her guidance counselor, Jacquelyn Hall.  Nicole, accompanied by
Caitlin, met with Hall on October 20, telling her that Grumman
"was saying some things that made them feel uncomfortable."[5]
After Nicole began relating Grumman's comments about her getting
stuck in the window, Hall directed her and Caitlin to write the
comments down, which they did, in signed statements that
described all of the incidents just discussed.

Hall assured Nicole that she would give her statement to the
school's principal, who would "talk to Mr. Grumman and hopefully
it will stop.  And if it doesn't stop you need to let me know."
Hall says that she also informed Nicole of the possibility that

---

[4]Nicole testified about a further incident where she asked
Grumman to borrow a pencil, "[a]nd he said that he had one and he
would give it to me because he liked me.  And then when I walked
away [C]aitlin said that he was looking at me like at my bottom."
While Nicole's account of Grumman's statement is admissible, her
account of Caitlin's statement is hearsay, and therefore cannot
be considered on summary judgment, as discussed supra.

[5]There are varying accounts of whether Nicole and Caitlin
went to their guidance counselors at the same time or not.
Reconciling them is not necessary to deciding the summary
judgment motions.

she could transfer to another biology class with a different
teacher, but that the switch would have necessitated changing two
other class as well, and that Nicole said "she would wait to see
how it went before she did that."  Nicole, though, denies that
anyone ever offered to switch her out of Grumman's class.

Within a few days of Nicole's meeting with Hall, the
principal, defendant Leo Paul Couture, had reviewed Nicole's
statement and met with Grumman and a representative from the
teachers' union.  Grumman did not deny making the comments
described in the statement--which included the remarks about her
getting stuck in the window and the "Big Red" nickname on her
pants--but, in Couture's words, "put it in context."[6]  Grumman
explained, for example, that the window comment was intended to
convey that the DNA molecule, because of its relatively large
size, could not fit through the pores in the nucleus of the cell.
Grumman also explained that the comment about the pants was an
honest inquiry about the school's nickname.  Couture told Grumman
that his comments "were inappropriate and the students did not
find them to be humorous."  Couture did not, however, consider

_____

[6]While Couture does not believe he had seen Caitlin's
statement until after this meeting, Grumman recalled having been
shown a copy at the meeting itself.  This dispute has no bearing
on the outcome of the summary judgment motions.  Grumman
acknowledged making the comments recounted in Caitlin's
statement, at least in substance.

the comments to be sexual harassment.  In any event, Grumman agreed not to "make those types of comments anymore."

Couture arranged a meeting with Nicole, Caitlin, and the school's vice principal roughly one week later.  Couture told Nicole that, having read her statement, he found Grumman's comments inappropriate, met with him, and directed him to stop making such remarks.  Couture also conveyed that Grumman wanted to apologize.  Nicole's response to this information was "quiet," according to Couture, or "like, okay," according to her.  At the end of the meeting, Nicole and Caitlin were directed to go back to Grumman's class (where, it appears, they had been when summoned to the meeting), which made Nicole "really uncomfortable."  Grumman recalls that, after the girls returned, Couture arrived and, outside of the classroom, informed him "that they did not wish to speak to me, they did not wish an apology individually in front of the class or anything of that sort." Nicole confirmed that those were her wishes because, as she put it, "I didn't want him around me."

Nicole perceived that Grumman "acted differently" toward her after her meeting with Couture:  he put her in the back of the class, called on her less, did not take her questions, and "kind of shrug[ged] [her] off."  But when Hall, the guidance counselor, called Nicole in for a meeting at the end of October to follow up on her complaint, Nicole said there had been no further issues.

8

Nicole made similar remarks to Hall in November, when she also said that biology class was going fine, and in March, after the course had ended.  In line with these reports, Nicole testified at one point in her deposition that Grumman's offensive statements stopped "very quickly" after she complained to Hall; elsewhere in her deposition, however, she said that Grumman "made a few" comments she "felt were inappropriate" even after that point, though the plaintiffs have not endeavored to explain what those were.[7]  Nicole received a grade of B+ in the class, consistent with her grades in her other classes that marking period (A+, A, and B-) which, so far as the record indicates, were consistent grades in other marking periods as well.

Nicole recalls that, in October 2005 "when things were going on," she had difficulty sleeping.  Her mother remembers that Nicole "wouldn't get up.  She wouldn't eat."  Nicole also said that she "just didn't want to do anything" and "was afraid to hang out with people at Stevens because I was afraid they would talk about what happened" in Grumman's class.  In fact, Nicole noticed boys from the biology class laughing at her in the school hallways, even after the course had ended.  In April 2006, Nicole began discussing Grumman's comments with a counselor from Women's

---

[7]Nicole recalled an incident where, after the course had ended, Grumman "wanted me to come in and work hours for him in his classroom" as punishment for not turning in her textbook. But Nicole did not comply, based at least in part on her mother's concerns.

Support Services, which "provides emotional support only to
clients--not clinical therapeutic support."  Nicole spoke to the
counselor, sometimes over the phone, roughly five times in April
and May 2006, then once again in August 2006.[8]

Nicole attempted to avoid walking by Grumman's classroom on
her way to other classes--he made a habit of standing in the
hallway between periods--but still ended up passing him about
twice each week.  After the biology class ended in late January
2006, however, Grumman's presence at the school was limited due
to his own medical problems.  He had foot surgery in late
February that required him to miss school until the middle or end
of May and then, within two weeks of returning, broke a bone in
the same foot and missed the rest of the academic year.  Nicole
did not know the reason for Grumman's absence; her parents, for
their part, believed he had been terminated, though they did not
have any discussion with school personnel about the outcome of
Nicole's complaint against Grumman until April 2006.

Around that time, Nicole's father became engaged in a series
of communications with school officials, disputing an academic
requirement that had been imposed on Nicole's sister, Amber, a

---

[8]In January 2007, Nicole began seeing a different counselor,
but talked with her about other goings-on in her life at that
time, not about Grumman.  Nicole did discuss Grumman's comments,
as well as other subjects, with a third counselor she saw in
March 2007, but did not resume seeing her again until October
2007.

senior at Stevens.  Amber incurred the requirement by missing a
mandatory rehearsal for an arts class while she was visiting the
University of New Hampshire, which she planned to attend on a
swimming scholarship, to meet with the coach.  After her father's
communications produced a lengthy letter from Couture presenting
his view of the circumstances surrounding the absence and a
proposal for ending the dispute, Nicole's father called a school
board member, complaining that Couture "can send me a several
page letter" about the dispute over Amber's class but "on this
incident with Nikki we never heard a thing."

In response, the school board member contacted the
superintendent, Jacqueline Guillette, who in turn immediately
summoned Couture and Hall to ask them what they knew about
Grumman's comments to Nicole.  Guillette directed Couture to
contact the Brodeurs "and say very honestly it appears we've
dropped the ball here."  Couture, in fact, had no recollection of
Nicole's complaint at all when Guillette questioned him about it.

**C.   The school's sexual harassment policy**

The Stevens High sexual harassment policy, as set forth in
the 2005-2006 student handbook, defines sexual harassment, in
relevant part, as "verbal or physical conduct or communication of
a sexual nature" which "has the purpose or effect of
substantially or unreasonably interfering with an individual's

11

. . . education, or creating an intimidating, hostile, or offensive . . . education environment."  The policy designates the principal as "the person responsible for receiving oral or written reports of sexual harassment . . . .  Upon receipt of a report, the principal must notify the Superintendent immediately without screening or investigating the report."

The policy directs the superintendent to then "authorize an investigation," including interviews with the complainant and the person complained against as well as "any other methods and documents deemed pertinent by the investigator."  If, as a result of this investigation, the complaint is found to be valid, the policy empowers the school district to "take such disciplinary action as it deems necessary and appropriate, including warning, suspension, or immediate discharge to end sexual harassment and . . . prevent its recurrence."  In the meantime, however, the superintendent may "take immediate steps, at [her] discretion, to protect the complainant, students, and employees pending completion of an investigation."

As Couture acknowledged at his deposition, this policy does not authorize him, as principal, to decide--as he admits to doing in Nicole's case--that an incident does not rise to the level of sexual harassment.  In fact, Guillette instructed him when they met in response to Nicole's father's complaint to the school

12

board member that, in the future, he should simply report claims
of sexual harassment to her rather than judging them himself.

As directed by Guillette, Couture attempted to call Nicole's
father, who refused to speak to him about her complaint.  Couture
then sent a letter to Nicole's father, in late April 2006,
acknowledging that there had been no disciplinary action against
Grumman and expressing "regret that this matter has gone
unresolved for as long as it has."  Couture also offered to
investigate "in accordance with our policies regarding sexual
harassment," and asked for permission to interview Nicole, with
her father present, as part of that process.  But the Brodeurs
did not allow Nicole to be interviewed because they had already
retained counsel on her behalf at that point.

The Brodeurs, in fact, had no direct contact with anyone
from the school about Nicole's complaint after her father's call
to the school board member in April.  In July, the Brodeurs
decided that Nicole would not return to Stevens in the fall due
to what they perceived as uncertainty about Grumman's status for
the upcoming academic year.  The Brodeurs eventually chose
Vermont Academy, a private secondary school, instead.  As it
turns out, Grumman was returning to Stevens for the 2006-2007
academic year, though the Brodeurs did not know it:  Guillette
explained that, by the time she learned of Nicole's complaint,
the school board had already voted to renew Grumman's contract

13

for the upcoming school year, and that, on advice of counsel, she
refrained from proceeding with an investigation without Nicole's
participation.  At the end of the 2006-2007 academic year,
however, Grumman retired, apparently of his own accord.

**D.    Prior complaints against Grumman**

Before receiving Nicole's complaint, Couture had
investigated other charges of inappropriate comments by Grumman,
while he was serving as head coach of the Stevens girls' varsity
soccer team.  The first complaint took the form of a pseudonymous
letter that Guillette's predecessor as superintendent received
early in the winter of 1999, alleging, among other things, that
Grumman "made sexual comments to the girls on the field," "pulled
the shorts on one girl, because she had what they call a wedgie,"
and "embarrasses the girls in his science class with comments"
suggesting their promiscuity.

In response, Couture interviewed several members of the
previous fall's team, who recounted a number of instances of
inappropriate behavior by Grumman.  These included (1) taking a
girl's bra from her gym bag and commenting on it, (2) telling the
girls to think about sex to make themselves smile for the team
photo, and (3) making vaguely suggestive comments about their
breasts.  The girls interviewed, however, said that nobody had
actually seen Grumman touch the girl's shorts as the letter

14

alleged--that the girl had felt someone do that to her and, when she starting accusing her teammates, some suggested that it had been Grumman.  When Couture interviewed Grumman, he denied "any incidents which he would view in retrospect as sexual harassment," but acknowledged the chance for "misinterpreted joking and kidding."

Finding "evidence to suggest that the girls interviewed have indeed been embarrassed by what has generally been described as Mr. Grumman's kidding," Couture recommended that Grumman

> meet with both the JV and varsity teams in my presence
> . . . with the express purpose of apologizing to
> any/all who may have been offended.  Furthermore, . . .
> Mr. Grumman must be give an opportunity to demonstrate
> his agreement that these types of comments must stop.
> Failure on Mr. Grumman's part to stop must logically
> result in further disciplinary action.

Grumman apologized as directed, and there was no further action.

In October 2002, the Stevens athletic director received another complaint about Grumman, this time from a parent of one of the girls on the team, alleging that Grumman had told the team a graphic and offensive story during a pre-game speech.  Couture again interviewed several girls on the team as part of his investigation.  Based on these interviews, Couture determined that the story involved a teenaged girl who, though "very tired from trying to balance work with school and athletics," agreed to work late at her job one night.  After finally leaving, with the door locked behind her, the girl approached her car, parked in an

unlighted section of the lot.  But "suddenly she felt [a] hand over her mouth and her head was slammed against the hood of her car.  She was turned around, still with a hand over her mouth, and the molester put his other hand up under her skirt and tore her underwear.  He then grabbed her crotch."

Grumman then brought the tale "to an abrupt end" and asked the players to identify the girl in the story.  Some players suggested that the girl represented their team, which Grumman confirmed, then asking, "Who's the molester?"  After the girls responded with the name of the team they were playing that day, Grumman asked what the girl should have done; the girls suggested various ways of fighting back.  Grumman said that "as a team they needed to fight back against the molester in the story," i.e., their opponent that day.

Most of the girls interviewed by Couture said that the story had upset them, and their teammates, to one degree or another.  And some reported other inappropriate comments by Grumman, such as referring to one team member as a lesbian (after she claimed to be one in response to Grumman's suggestions that she date the male team manager) and to another team member's "thunder thighs."  One student, in response to Couture's question whether she considered the story "uncharacteristic" for Grumman, mentioned "a time when he made two girls in class get up on a table and massage each others' stomachs.  I think they were suppose[d] to

16

be doing the Heimlic[h] maneuver, but it made them feel very
uncomfortable."  When Couture interviewed Grumman, he explained
that he had conceived the sexual assault story "as an analogy to
pump the players up" for their game and did not dispute the
players' account of it.  But Couture did not ask Grumman, or
anyone else, about the other inappropriate comments reported by
the players.

Based on Couture's report of his investigation, Guillette,
who had just begun working as the superintendent at that point,
dismissed Grumman from his coaching position, finding the story
"highly offensive, inappropriate, unprofessional, and
unacceptable."  Thus ended Grumman's 20-year tenure as the girls'
varsity soccer coach at Stevens.  Guillette also barred Grumman
"from any future coaching positions within" the district and from
"volunteering with any athletic teams or athletic gatherings
under the auspices of" the district, at least through the end of
the academic year, when Guillette would "review the situation."
Guillette also expressed concern "as to whether or not this
conduct has had or will have a negative impact on your ability to
be effective in the classroom for all students."

Beyond Guillette's warning against "any recriminations or
repercussions within the classroom or school setting with or
toward any students," however, Grumman did not face any
heightened scrutiny of his behavior in the classroom as a result

17

of the 2002 investigation.  As Guillette explained in her
deposition, "this happened in soccer, and we took him away from
soccer."  Guillette also said that she did not know whether she
had learned of the 1999 incident, which occurred before she came
to the school district, while handling the 2002 incident.

   After completing about five hours' worth of informal sexual
harassment training, as Guillette had suggested, Grumman applied
to coach the girls' varsity field hockey team for the fall 2004
season.  As part of the interview process, the Stevens athletic
director met with Grumman and four upperclassmen from the field
hockey team.  During this meeting, according to one of the girls
who attended, Grumman named a particular girl, since graduated
from the school, and said he had attempted to recruit her for the
soccer team by telling her she would look good in a soccer
jersey.[9]  At least one of the girls at the meeting later told
Couture that she considered this a "red flag."  The athletic
director, noting that the interviewers considered such comments
"offensive and unnecessary," informed Grumman that he would no
longer be considered for the job.

---

[9]Grumman explained at his deposition that he meant the girl
in question would have "looked good" in a uniform for a variety
of sports "[b]ased on her ability to play as an athlete."

18

## III. **Analysis**

As mentioned at the outset, the Brodeurs, acting on Nicole's as well as their own behalf, have brought a claim against the District for violating Title IX, as well as a number of state-law claims against the District, Grumman, and Couture.  Their complaint asserts twelve numbered counts:

- violation of Title IX, against the District (count 1);

- breach of contract, against the District (count 2);

- breach of fiduciary duty, against the District (count 3);

- negligence in failing "to enforce the rules contained in the Handbook," i.e., the school's sexual harassment policy, against all defendants (count 4);

- negligence in failing to "adhere to all federal and state regulations established for the operation of a public educational facility receiving state and local funding," i.e., the school's sexual harassment policy, against the District (count 5);[10]

- negligence in failing "to protect [Nicole] from abuse by the School District's employees," against the District (count 6);

- negligence in hiring and retaining Grumman, against the District (count 7);

- negligence in failing "to properly train its staff to identify and respond to sexual harassment in general and in particular to exercise reasonable care in the supervision of Grumman," against the District (count 8);

- negligence in failing "to warn Plaintiff of Grumman's propensities," against the District (count 9);

---

[10]The plaintiffs acknowledge that the school's sexual harassment policy is "[i]dentical to the District's Title IX Procedure."  They have not identified any other federal or state regulations implicated here.

• negligent infliction of emotional distress, against all
defendants (count 10);

• intentional infliction of emotional distress, against all
defendants (count 11);

• "respondeat superior/vicarious liability/agency" against
the District for the "negligent acts" of its "employees,
servants, or agents" and "the conduct of the individual
defendants" (count 12).

The complaint seeks a variety of compensatory and other damages,

including for "mental and emotional harm" on behalf of both

Nicole and her parents.

The defendants have moved for summary judgment on all of the

plaintiffs' claims.  First, the District argues that the

plaintiffs have not come forward with evidence sufficient to

establish its liability under Title IX.  Second, the defendants

attack the plaintiffs' state-law claims on a number of grounds,

arguing that (a) the breach of contract claim fails because the

student handbook is not a contract as a matter of law; (b) the

tort claims are barred by the doctrine of discretionary function

immunity; and (c) the defendants' conduct did not amount to

intentional infliction of emotional distress as a matter of law.

Third, the defendants argue that (a) Nicole's parents cannot

recover in negligence because they did not "contemporaneously

witness a serious injury to their child" and (b) neither they nor

Nicole can recover for their claimed emotional distress because

they lack the requisite expert testimony that the distress had physical manifestations traceable to the defendants' conduct.[11]

## A.    The Title IX claim (Count 1)

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," with a number of exceptions not relevant here.  28 U.S.C. § 1681(a).  The Supreme Court has "concluded that sexual harassment is a form of discrimination for Title IX purposes and that Title IX proscribes harassment with sufficient clarity to . . . serve as the basis for a damages action."  <u>Davis ex rel. LaShonda D. v. Monroe County Bd. of Educ.</u>, 526 U.S. 629, 649-50

---

[11]The defendants also challenge the plaintiffs' entitlement to other categories of damages, arguing that (1) they cannot meet the standard for enhanced compensatory damages under New Hampshire law, (2) they cannot recover the tuition and other fees paid to Vermont Academy because they failed to comply with the state-law administrative framework for transferring a student to a different school, and (3) even if they can recover the tuition, they are limited to what was actually paid, i.e., not including the scholarships, despite the collateral source rule.  Following oral argument, however, the court asked the parties to submit briefing on two additional issues in the form of pre-trial motions in limine: (4) whether New Hampshire law permits recovery of enhanced compensatory damages in the absence of compensatory damages, and (5) whether Nicole's parents can recover the Vermont Academy expenses even though, as explained <u>infra</u>, they have no claim of their own against the defendants.  Since the court will decide these issues, to the extent necessary, in the context of ruling on the motions in limine, the defendants' motions for summary judgment are denied without prejudice as to these points.

(1999).  But "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  Id. at 650.

In moving for summary judgment, the District does not dispute that Stevens High is an "education program or activity receiving Federal financial assistance" bound to comply with Title IX.  The District does, however, argue that (1) it had "no actual notice that Nicole believed that Mr. Grumman was sexually harassing her," (2) it was not deliberately indifferent to the complaints against Grumman, arising from his behavior as either Nicole's biology teacher or as the girls' varsity soccer coach, and (3) the harassment was not so severe, pervasive, and objectively offensive so as effectively to deprive Nicole of access to the school's educational opportunities or benefits.

### 1.   Actual knowledge of the harassment

The Supreme Court has rejected liability in damages under Title IX for the actions of a funding recipient's employees on theories of respondeat superior or constructive notice.  See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 287, 288-90 (1998).  Instead, the Court has held, "a damages remedy will not

lie under Title IX unless an official who at a minimum has
authority to address the alleged discrimination and to institute
corrective measures on the recipient's behalf has actual
knowledge of discrimination in the recipient's programs and fails
adequately to respond." Id. at 290.  Without disputing that
Couture, as the principal of Stevens High, had the requisite
authority to address alleged sexual harassment by one of its
teachers and to institute corrective measures on its behalf, the
District argues that Couture lacked actual knowledge of any such
harassment.  This is so, according to the District, because all
Nicole reported to Hall, her guidance counselor, was "that Mr.
Grumman was saying things in class that made her and another
student feel uncomfortable."  The District's premise is flawed.

While Nicole's report to Hall began with the complaint that
Grumman was saying things that made Nicole and Caitlin "feel
uncomfortable," the report certainly did not end there.  That
alone distinguishes this case from the District's sole authority
on this point, Johnson v. North Idaho College, No. 06-436, 2008
WL 4000128 (D. Idaho Aug. 28, 2008), where the court ruled that
"[a] comment made by a student that her professor makes her
'uncomfortable,' without more detail, cannot be equated to a
complaint of sexual harassment."  Id. at *9; see also Rost ex
rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114,
1119 (10th Cir. 2008) (finding that plaintiff's statement "that

the boys were bothering her was insufficient to give the district notice that she was being sexually harassed").

At Hall's urging, in fact, Nicole and Caitlin proceeded to describe, in writing, Grumman's comments, which included not only his remark about how the size of Nicole's buttocks would prevent her from fitting through a window, but also his similar quips about the appearance of the words "Big Red" on the seats of the girls' pants, his direction to a boy to draw a circle "as big as Caitlin's butt," and his aside that he thought "that"--meaning Caitlin--was "sexy."[12]  A jury could readily find that these accounts of Grumman's comments, which Hall promptly passed on to Couture, amount to the "actual knowledge of discrimination" necessary to subject the District to liability under Title IX. See Hunter ex rel. Hunter v. Barnstable Sch. Comm., 456 F. Supp. 2d 255, 265-67 (D. Mass. 2006) (finding actual knowledge requirement "easily satisfied" based on plaintiffs' report of harassment to school principal), aff'd sub nom. Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165 (1st Cir. 2007), rev'd on other grounds, 129 S. Ct. 788 (2009).

---

[12]Taking the facts in the light most favorable to the plaintiff, Nicole and Caitlin simultaneously presented their complaints against Grumman to Hall, and Couture, in turn, dealt with those complaints together.  See notes 5-6 and accompanying text, supra.  For simplicity's sake, then, the court will not further distinguish between Nicole's and Caitlin's complaints, except as it bears upon the question of the harassment's severity, see infra Part III.A.3.

Furthermore, the plaintiffs argue that, regardless of what Nicole told Hall about Grumman's comments in October 2005, both Couture and the District "had actual knowledge of Grumman's propensity to sexually harass adolescent girls" based on the investigations into his comments to members of the girls' soccer and field hockey teams in 1998, 2002, and 2004.  Many, but not all, courts have endorsed this theory of notice under Title IX: that "actual knowledge of discrimination" can take the form of knowledge about the alleged harasser's conduct toward others which indicates some degree of risk that the harasser would subject the plaintiff to similar treatment.  See, e.g., Williams v. Bd. of Regents, 477 F.3d 1282, 1295-96 (11th Cir. 2007); Delgado v. Stegall, 367 F.3d 668, 672 (7th Cir. 2004); J.K. v. Ariz. Bd. of Regents, No. 06-916, 2008 WL 4446712, at *13-*14 (D. Ariz. Sept. 30, 2008); Johnson v. Galen Health Insts., Inc., 267 F. Supp. 2d 679, 687-88 (W.D. Ky. 2003); Hart v. Paint Valley Local Sch. Dist., No. 01-004, 2002 WL 31951264, at *6 (S.D. Ohio Nov. 15, 2002); Doe v. Sch. Admin. Dist. No. 19, 66 F. Supp. 2d 57, 63 (D. Me. 1999); but see Baynard v. Malone, 268 F.3d 228, 238 (4th Cir. 2001) ("Title IX liability may be imposed only upon a showing that school district officials possessed actual knowledge of the discriminatory conduct in question").

Though the First Circuit Court of Appeals has never explicitly considered the contours of "actual knowledge" under

Title IX, it appears to have recognized the plaintiffs' theory, at least implicitly, in Wills v. Brown University, 184 F.3d 20 (1st Cir. 1999).  There, at the trial of the plaintiff's Title IX claim against her university alleging that one of her professors had touched her inappropriately, the district court allowed evidence that the university knew--before that incident--that the professor had engaged in similar conduct toward another student, but disallowed evidence that--after the incident involving the plaintiff--the university received complaints of the professor's similar conduct toward additional students as well.  Id. at 26. In upholding this ruling, the court of appeals observed that "evidence of an inadequate response is pertinent to show fault and causation where the plaintiff is claiming that she was harassed or continued to be harassed after the inadequate response."  Id. (citing Gebser, 524 U.S. at 290).

Wills, then, like the majority of the federal case law, supports the plaintiffs' view that a defendant's notice of an alleged harasser's "propensity" toward such behavior, based on his reported treatment of other students, amounts to "actual knowledge of discrimination" sufficient to trigger liability for damages under Title IX.  See Morrison v. N. Essex Cmty. Coll., 780 N.E.2d 132, 144 (Mass. App. Ct. 2002) (relying on Wills to hold that actual "knowledge could derive from having learned that an individual had previously harassed other students").  Because

26

the District has argued only that Nicole's complaint itself was
inadequate, however, the court need not decide whether the prior
allegations against Grumman were sufficient as a matter of law to
create the actual knowledge essential to the District's liability
for his subsequent treatment of Nicole.[13]  Based on Nicole's
complaint alone, the plaintiffs have presented a trialworthy
issue as to the District's actual knowledge.

### 2.    Deliberate indifference to the harassment

Even after an appropriately empowered school official has
actual knowledge of the discrimination, a school will not incur
liability for damages under Title IX unless its response
"amount[s] to deliberate indifference"--tantamount, in other
words, to "an official decision by the recipient not to remedy

---

[13]The court also need not decide how strongly the treatment
of others must demonstrate the harasser's "propensity" toward
such conduct.  Some courts have held that "the 'actual knowledge
need only be of facts indicating that the teacher has the
potential to abuse a student," Tesoriero v. Syosset Cent. Sch.
Dist., 382 F. Supp. 2d 387, 397 (E.D.N.Y. 2005); others have
rejected the view that to "know in a general sense that there is
a risk that . . . teachers will harass a student sexually" is
enough, holding instead that "actual knowledge" contemplates
"risks so great that they are almost certain to materialize if
nothing is done," Delgado, 367 F.3d at 672; still others have
struck upon an intermediate standard, holding that "'[a]n
educational institution has 'actual knowledge' if it knows the
underlying facts, indicating sufficiently substantial danger to
students, and was therefore aware of the danger,'" Bostic v.
Smyrna Sch. Dist., 418 F.3d 355, 361 (3d Cir. 2005) (quoting 3C
Kevin C. O'Malley et al., Federal Jury Practice & Instructions
§ 177.36, at 726 (5th ed. 2001)).  Choosing from among these
standards remains a task for trial, if necessary.

the violation." <u>Gebser</u>, 524 U.S. at 290.  To satisfy this standard, a plaintiff must show that the funding "recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." <u>Davis</u>, 526 U.S. at 648.[14]

The District argues that neither its responses to the complaints about Grumman's conduct as the girls' varsity soccer coach nor its handling of Nicole's complaint rose to the level of deliberate indifference as a matter of law.  The court disagrees on both counts.  It is true that, as the District points out, "[e]ach complaint" of Grumman's inappropriate comments to members of the girls' varsity soccer team in 1998 and 2002 was "investigated and corrective action taken."  A jury could find, however, that the investigative or the corrective aspect of the District's response to the incidents as a whole was so lacking as to amount to deliberate indifference.

The 2002 complaint against Grumman arose out of his subjecting the entire team to a graphic story of the sexual assault of a girl their age by an assailant in a darkened parking

---

[14]Though the Supreme Court articulated the "clearly unreasonable" test as the standard of school liability for student-on-student sexual harassment, the parties agree that the same test applies to claims of teacher-on-student sexual harassment.  <u>See</u> <u>Williams ex rel. Hart v. Paint Valley Local Sch. Dist.</u>, 400 F.3d 360, 367-68 (6th Cir. 2005); <u>Garcia ex rel. Marin v. Clovis Unified Sch. Dist.</u>, No. 08-1924, 2009 WL 1034264, at *5 n.4 (E.D. Cal. Apr. 16, 2004).

lot, including details that the assailant tore the girl's underwear and grabbed her crotch.  Couture's investigation revealed that the story had upset most of the girls on the team, and that Grumman had made additional remarks, of the kind that put him in hot water in 1999--and which he had agreed, as part of the resolution of that prior complaint, to refrain from making. Nevertheless, Couture's report of the 2002 investigation made no reference to the 1999 investigation he had personally conducted, and the superintendent could not remember whether she had learned of the prior investigation before deciding how to discipline Grumman for the 2002 incident.  And while that discipline entailed Grumman's immediate dismissal from his job as the girls' varsity soccer coach, as well as an indefinite suspension from other coaching or volunteer athletic activities, it did not affect his classroom duties at all (aside from a warning not to retaliate against any team members in class).

Though the conclusion is by no means inevitable, a jury could find that this response amounted to deliberate indifference.  A "school's investigation, though promptly commenced . . . may be carried out so inartfully as to render it clearly unreasonable."  Fitzgerald, 504 F.3d at 175 (citing Sch. Admin. Dist. No. 19, 66 F. Supp. 2d at 64-65).  While certain aspects of the 2002 investigation, like the interviews with the players, were by all accounts carried out diligently, a jury

29

could find other aspects of the probe "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." Id. at 175.  First, in responding to the 2002 incident, the District failed even to take into account its conclusion, based on Couture's own prior investigation, that Grumman had made other sexually charged remarks to team members during the 1998 season.  Second, in light of that fact, to say nothing of the explicit and disturbing nature of the story Grumman told the team in 2002, a jury could find that the District acted in a clearly unreasonable way by failing to take any action at all to ensure that Grumman did not engage in similar behavior in the classroom.

So far as his report of the 2002 investigation reveals, Couture did not attempt to question any of Grumman's students about that subject, simply asking the girls on the team he interviewed whether they found the "story to be uncharacteristic of Mr. Grumman from their past experience."  Indeed, Couture did not even follow up when one of the players responded to that question with an account "about a time when [Grumman] made two girls in a class . . . get up on a table and massage each others' stomachs" under the guise of demonstrating the Heimlich maneuver. And this was despite Couture's awareness, from the anonymous complaint of 1999, of other alleged inappropriate classroom

behavior by Grumman, including remarks of a sexual nature,[15] as well as Guillette's concern, stated in the letter of reprimand for the 2002 incident, "as to whether or not [the 2002] conduct has had or will have a negative impact on [Grumman's] ability to be effective in the classroom for all students."

Considering the totality of the information available in 2002, a jury could find that the District acted with deliberate indifference in neither investigating Grumman's conduct in the classroom nor taking any prophylactic measures, such as training or monitoring, to ensure that his inappropriate remarks were in fact restricted to the soccer field. See Theno v. Tonganoxie Unified Sch. Dist. No. 464, 394 F. Supp. 2d 1299, 1311-12 (D. Kan. 2005) (ruling that evidence supported jury's finding of deliberate indifference where "although at times the school administrators appeared to have given meaningful attention to some . . . complaints of harassment, at other times school personnel apparently chose to turn a blind eye"); Hart, 2002 WL 31951264, at *8 (denying summary judgment for defendant on deliberate indifference aspect of Title IX claim in absence of "protective measures or procedures for students or staff to

---

[15]Despite this allegation, Couture appears to have interviewed only members of the girls' soccer team (and Grumman) during his investigation of the 1999 complaint, at least based on the record before the court.

31

follow" in monitoring teacher who had previously been accused of inappropriate touching).

Indeed, a jury could find the District's thinking that "this happened in soccer, so we took him away from soccer" to be clearly unreasonable both in its premise--there is evidence, again, that allegations of Grumman's inappropriate behavior extended beyond his actions as coach--and its conclusion--given Grumman's history of making sexually charged comments, even after agreeing to refrain from them.[16]

This is not to say, of course, that a jury could not see the case differently, agreeing with the District that its response to the prior complaints, while imperfect, was "within a universe of plausible investigative procedures" and outcomes.  Fitzgerald, 504 F.3d at 175.  After all, the record reveals no allegations of inappropriate behavior by Grumman whatsoever until 1999; an additional four years passed between those allegations and their 2002 counterparts; and an immediate termination from the girls' varsity soccer coaching job and an indefinite suspension from any involvement in school athletics is hardly a slap on the wrist. Furthermore, deliberate indifference under Title IX is "a stringent standard of fault, requiring proof that a [defendant]

---

[16]In fact, as discussed supra, Grumman made a comment to members of the girls' varsity field hockey team in 2004 about a particular girl's looking good in a uniform which some of them, as well as the athletic director, found offensive.

disregarded a <u>known or obvious</u> consequence of [its] action or inaction." <u>Porto v. Town of Tewksbury</u>, 488 F.3d 67, 73 (1st Cir.) (internal quotation marks omitted), <u>cert. denied</u>, 128 S. Ct. 510 (2007).  But, while the record could therefore support a finding that the District was not deliberately indifferent, it by no means compels that conclusion as a matter of law.

There is also the plaintiffs' argument that, whatever can be said of the District's handling of the allegations against Grumman by others, the District displayed deliberate indifference in handling the complaint by Nicole, principally by failing to follow its own sexual harassment policy.  While departures from the strictures of such a policy do not necessarily indicate deliberate indifference, <u>see</u> <u>Rost</u>, 511 F.3d at 1122 (finding no deliberate indifference where, instead of interviewing witnesses as dictated by its policy, defendant relied on police investigation); <u>Oden v. N. Marianas Coll.</u>, 440 F.3d 1085, 1089 (9th Cir. 2006) (finding no deliberate indifference in violating time deadlines of harassment policy), a wholesale failure to employ established procedures for investigating sexual harassment complaints is a different story.  <u>See</u> <u>Chancellor v. Pottsgrove Sch. Dist.</u>, 501 F. Supp. 2d 695, 709 (E.D. Pa. 2007); <u>Michelle M. v. Dunsmuir Jt. Union Sch. Dist.</u>, No. 04-2411, 2006 WL 2927485, at *5-*6 (E.D. Cal. Oct. 12, 2006).

Here, though the District's policy requires a school principal who receives a sexual harassment complaint to "notify the Superintendent immediately without screening or investigating the report," Couture never passed Nicole's complaints about Grumman's comments on to Guillette, who is the official empowered by the policy to authorize an investigation and to take corrective action.  So no official investigation commenced.

The District acknowledges that the sexual harassment policy was not followed, but maintains that Couture's response was still not clearly unreasonable because he did not "view[] the comments as sexual harassment."[17]  The best that can be said of this argument for the moment is that a jury could rationally find otherwise--in the sense that either the policy's rule against a principal's "screening" a complaint clearly forbade Couture from making that determination, or that, even if he reasonably

---

[17]The District also relies on the deposition testimony of Nicole's guidance counselor, Hall, that she did not "view[] the comments as sexual harassment."  Hall's testimony, in response to a question as to whether she was "consciously" following the harassment policy in immediately forwarding Nicole's complaint to Couture, was actually, "This one incident doesn't make sexual harassment.  Continued incidents would.  So it needed to be addressed to begin with."  This statement is at best ambiguous as to whether Hall believed Nicole was complaining of sexual harassment which, in any event, is not the same issue as whether the District acted with deliberate indifference in not following the harassment policy.  The court also notes that the District has not submitted the next page of the transcript of Hall's deposition--just after counsel asks her why she asked Nicole to put her complaint in writing--but has submitted the page after that, by which point counsel has moved on to another subject.

believed to the contrary, he could not have also reasonably believed that complaints of a male teacher's repeated comments to the class about the size of his female students' buttocks were not complaints of sexual harassment.  Cf. Billings v. Town of Grafton, 515 F.3d 39, 51 (1st Cir. 2008) (refusing to "accept . . . that a man's repeated staring at a woman's breasts is to be ordinarily understood as anything other than sexual" in the context of a Title VII harassment claim).

Indeed, Couture admitted at his deposition that it was not up to him to decide whether a complained-of incident rises to the level of sexual harassment and, after learning that Nicole's complaint had not been investigated, Guillette instructed Couture to tell the Brodeurs "very honestly it appears we've dropped the ball here."  Whether this self-described "dropping the ball" amounts to deliberate indifference is a question for the jury. See Chancellor, 501 F. Supp. 2d at 709 (denying summary judgment for defendant on the deliberate indifference element of a Title IX claim where a principal failed to report an alleged sexual relationship between a student and teacher to the superintendent as required by the school's sexual harassment policy).

The District also argues that, even though it did not follow its sexual harassment policy, it nevertheless responded to Nicole's complaint in a way that was not clearly unreasonable: Couture told "Grumman the comments needed to cease," and Hall,

35

the guidance counselor, "told Nicole that she could change her
Lab Biology class . . . but Nicole decided to remain."  First,
however, Nicole has denied that anyone at Stevens offered to
transfer her out of Grumman's class, so a genuine issue of fact
remains as to whether the proposed transfer was even part of the
District's response--let alone whether the response was clearly
unreasonable.  See Fitzgerald, 504 F.3d at 174 n.6 (observing
that transferring the victim, rather than the perpetrator, in
response to a sexual harassment complaint could suggest
deliberate indifference under "certain circumstances").  Second,
as just discussed, a jury could find that simply telling Grumman
to stop making inappropriate comments manifested deliberate
indifference in light of his proven inability to abide by such
instructions in the past.  See Wills, 184 F.3d at 26 (noting
that, if an institution "learns that its measures have proved
inadequate" in preventing harassment, "it may be required to take
further steps to avoid new liability" under Title IX).

    To sum up, then, though the deliberate indifference standard
allows a court to "identify a response as not 'clearly
unreasonable' as a matter of law," Davis, 526 U.S. at 649, the
record here, taken in the light most favorable to the plaintiffs,
does not permit that approach.  A rational jury could find that
the District was deliberately indifferent in its response to

either the earlier complaints against Grumman by others, the
later complaints against Grumman by Nicole, or both.[18]

### 3.    Severity of the harassment

Another limitation on liability in damages for harassment
under Title IX is that it lies only for "sexual harassment of
students that is so severe, pervasive, and objectively offensive,
and that so undermines and detracts from the victims' educational
experience, that the victim-students are effectively denied equal
access to an institution's resources and opportunities." Davis,
526 U.S. at 651.  The Court, borrowing from its employment
discrimination case law, has held that "[w]hether gender-oriented
conduct rises to the level of actionable 'harassment' thus
'depends on a constellation of surrounding circumstances,
expectations, and relationships,' including, but not limited to,
the ages of the harasser and the victim and the number of

---

[18]Of course, to prevail on the Title IX claim, the
plaintiffs must also convince the jury that the deliberate
indifference in question caused Nicole to "undergo harassment,
made her more vulnerable to it, or made her more likely to
experience it." Fitzgerald, 504 F.3d at 171 (citing Davis, 526
U.S. at 645).  It is a substantial question whether, assuming the
District was deliberately indifferent to the complaints of
Grumman's behavior as a coach in 1998 and 2002, that deliberate
indifference had the requisite causal relationship to the claimed
harassment Nicole experienced in Grumman's classroom in 2005 to
hold the District liable for it under Title IX.  That question
need not be considered now, though, because the District has not
moved for summary judgment on that basis.

individuals involved."  Id. at 652 (quoting Oncale v. Sundowner
Offshore Servs., Inc., 523 U.S. 75, 82 (1998)).[19]

In contrast to this far-ranging approach, the District
argues principally that the plaintiffs cannot show harassment as
a matter of law due to the infrequency of Grumman's comments to
Nicole, which it counts as two in a two-month period.  But, while
Nicole's written statement listed only two specific comments,
i.e., that the size of her buttocks would prevent her from
fitting through a window and the "Big Red" remark, even that
account notes that "he's made other comments" and, moreover,
Nicole testified at her deposition that Grumman directed a total
of five or six "weird statements" or "sick comments" of this
nature at her.  There is evidence that these comments included
Grumman's telling a boy in the class to draw a circle on the
board "bigger . . . as big as Nicole's butt" and saying that
Nicole would "knock out all of the lockers" while walking down
the hall because her "butt . . . was so big."

Viewing the record in the light most favorable to the
plaintiffs, then, does not support the District's position that
Grumman directed only two inappropriate comments at Nicole.

---

[19]Because both the Supreme Court and the court of appeals
have applied employment discrimination caselaw dealing on the
concept of hostile environment in the Title IX context, see,
e.g., Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65-66 (1st
Cir. 2002), this court will do so throughout its discussion of
the severity of the harassment here.

Furthermore, according to Nicole, he also directed about as many
such comments at Caitlin in Nicole's presence, suggesting
"harassment of third parties [which] can help to prove a legally
cognizable claim of a hostile environment."  Hernandez-Loring v.
Universidad Metropolitana, 233 F.3d 49, 55 n.4 (1st Cir. 2000).
In any event, "'there is no magic number of incidents required to
establish a hostile environment claim,'" as this court has
previously observed.  L'Etoile v. New Eng. Finish Sys., Inc.,
2008 DNH 163, 15 (quoting Boumehdi v. Plastag Holdings, LLC, 489
F.3d 781, 789 (7th Cir. 2007)).

        While the frequency of harassing conduct has some bearing on
the overall hostility of the educational environment, see Brown
v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 540 (1st Cir.
1995), that question, as the Court made clear in Davis,
ultimately depends on much more.  The nature of Grumman's
remarks--calling the size of Nicole's buttocks to the attention
of the entire class on multiple occasions--and the students'
responses to it--including laughter by the boys in the class and
uncomfortable feelings by Nicole--suggests that the conduct was
"humiliating rather than a mere offensive utterance," also an
important factor in the hostile environment analysis.  Id.

        These facts accrue even greater weight in light of the
"constellation of surrounding circumstances, expectations, and
relationships," Davis, 526 U.S. at 651, which here include

derogatory comments by a fifty-five year old man about the buttocks of a fifteen-year old girl over whom he occupies a position of authority, as her teacher.  See Jennings v. Univ. of N.C., 482 F.3d 686, 697 (4th Cir.) (reasoning that the disparity in both age and power between a male soccer coach and his female players contributed to the overall hostility of the environment created by his frequent sexually charged comments) (en banc), cert. denied, 128 S. Ct. 247 (2007); EEOC v. R&R Ventures, 244 F.3d 334, 339-40 (4th Cir. 2001) (reversing summary judgment for defendant on hostile environment claim arising out of sexually charged comments by "an adult male in a supervisory position over young women barely half his age," including comments about one woman's buttocks).  Given the well-known sensitivity of adolescent girls to changes in their appearance as they mature, in fact, Nicole's testimony that such remarks made her "self-conscious" is hardly surprising.

So, while the court agrees with the District that Grumman's comments must be assessed in their "social context" in deciding whether they amount to actionable harassment, that exercise tends to make Nicole's educational environment appear more hostile, not less so as the District suggests.  The District's real point seems to be that the immediate context of the comments--at least as Grumman explained after the fact--was "to engage his students and maintain their interest in the class discussion" or, in the

40

case of the "Big Red" remark, an honest inquiry as to the
significance of that phrase as it appeared on Nicole's pants.
Putting aside the fact that this point does not explain Grumman's
other comments about Nicole's buttocks, the most it accomplishes
is providing some arguable basis for the jury to equate Grumman's
conduct with the kind of "simple teasing" and "offhand comments"
that are not actionable as harassment.  See Faragher v. City of
Boca Raton, 524 U.S. 775, 788 (1998).  But that is hardly the
only reasonable characterization of an older male teacher's
repeated comments to his class about a young female student's
buttocks, as just discussed.

       The District also relies on two district court cases ruling
that the plaintiff could not establish Title IX harassment as a
matter of law, suggesting that the facts there were no worse than
the facts here.  First, though, the court of appeals has
cautioned that "[t]he highly fact-specific nature of a hostile
environment claim tends to make it difficult to draw meaningful
contrasts between one case and another for purposes of
distinguishing between sufficiently and insufficiently abusive
behavior."  Billings, 515 F.3d at 49.  Second, one of the cases,
Jennings v. University of North Carolina, 340 F. Supp. 2d 666
(M.D.N.C. 2004), though originally affirmed by a panel of the
Fourth Circuit, 444 F.3d 255 (4th Cir. 2006), was later reversed
by the full court sitting en banc, 482 F.3d 686 (4th Cir. 2007),

41

with the majority of the en banc panel finding the conduct at issue "sufficiently severe or pervasive to create a sexually hostile environment."  482 F.3d at 698.  So that case, as cited supra, actually hurts the District's argument.

The other case, which arose out of an art teacher's hanging the plaintiff's photograph in a heart-shaped frame among those of other students and regularly telling the plaintiff that he loved her and referring to her as his girlfriend, is distinguishable. Doe-1 ex rel. Doe-1 v. Huddleston, No. 03-1107, 2006 WL 1582455, at *4 (C.D. Ill. June 6, 2006).  The court there observed that the teacher's conduct, toward a first-grader, was not "overtly offensive," id., but the same cannot necessarily be said of multiple remarks about an adolescent girl's buttocks.

In sum, the court cannot conclude, as a matter of law, that Grumman's behavior was not sufficiently severe, pervasive, and objectively offensive to give rise to a harassment claim under Title IX.  As the court of appeals has cautioned, "the hostile environment question is commonly one of degree--both as to severity and pervasiveness--to be resolved by the trier of fact on the basis of inferences drawn from a broad array of circumstantial and often conflicting evidence."  Billings, 515 F.3d at 50 (internal quotation marks omitted).  This case fits that description comfortably.

The District also contends that "Nicole has not alleged nor do the facts support that she was deprived of an educational opportunity." But the complaint expressly alleges that Grumman's harassment "interfer[ed] with her education," and the entirety of the District's argument on whether the record supports this claim is the single sentence that "Nicole received a B+ in Mr. Grumman's class and grades ranging from A+ to B- in [that] semester." This court "is free to disregard arguments that are not adequately developed," like this one. Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999).

In any event, though the Supreme Court has indicated that a dropoff in a student's grades "provides necessary evidence of a potential link between her education and [the harassing] misconduct," Davis, 526 U.S. at 652, it does not follow that a student cannot show she was "effectively denied equal access to an institution's resources and opportunities" by gender-based harassment unless her grades decline as a result. See Hayut v. State Univ., 352 F.3d 733, 748 (2d Cir. 2003); Montgomery v. Indep. Sch. Dist. No. 709, 109 F. Supp. 2d 1081, 1094 (D. Minn. 2000) (denying summary judgment for defendant on a claim under a state-law analog to Title IX "[a]lthough plaintiff's grades remained relatively average" during the period of harassment).

Without any developed argument from the District, the court cannot conclude as a matter of law that Nicole was not

43

effectively deprived of an educational opportunity or benefit as a result of Grumman's harassment.[20]  See Hayut, 352 F.3d at 748 (overruling summary judgment for defendant on Title IX claim where plaintiff's testimony that "she felt humiliation and emotional distress, did not want to attend classes, and was unable to sleep" as a result of her professor's harassing comments was "enough to render [the deprivation] issue one for the trier of fact").  Taking the record in the light most favorable to the plaintiffs, the District is not entitled to summary judgment on Nicole's Title IX claim.[21]

---

[20]The plaintiffs argue that, in addition to the effects of the harassment itself, Nicole was also deprived of an educational opportunity or benefit by Grumman's continued presence as one of her teachers even after she complained.  The court of appeals has mused that "[o]n some cases, merely to maintain a harasser in a position of authority over the victim, after notice of prior harassment, could create new liability" under Title IX.  Wills, 184 F.3d at 27.  Though this theory was extensively discussed at oral argument, the court need not consider it here because the District has not challenged it in its summary judgment briefing.

[21]Though the complaint asserts a Title IX claim against the District only, the plaintiffs argue in their summary judgment objection that "[a] jury could also find that Couture is personally liable."  As the language of § 1681 makes clear, however, liability under Title IX extends only to the recipient of federal funding--here, the District--not to its individual officials.  See Davis, 526 U.S. at 641; Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 611 (8th Cir. 1999) ("Several circuits have held that because they are not grant recipients, school officials may not be sued in their individual capacity under Title IX.").

**B.    The state-law claims**

**1.    Breach of contract (Count 2)**

The plaintiffs claim that the Stevens High student handbook amounts to a contract between the District and Nicole, which the District breached through its acknowledged failure to follow the handbook's sexual harassment policy.  The District, however, argues that the student handbook was not an enforceable contract as a matter of law.  While the parties agree that the New Hampshire Supreme Court has not addressed whether a student handbook constitutes a contract, they disagree, predictably, about how that court would rule when presented with the question.

As a federal tribunal exercising supplemental jurisdiction over the plaintiffs' state law claims, this court must predict the New Hampshire Supreme Court's future course on this issue. See FDIC v. Ogden Corp., 202 F.3d 454, 460-61 (1st Cir. 2000). This task requires an "an informed prophecy of what the [New Hampshire Supreme Court] would do in the same situation, seeking guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." Walton v. Nalco Chem. Co., 272 F.3d 13, 20 (1st Cir. 2001) (internal quotation marks omitted).  It also demands "considerable caution" and respect for the "well-marked

45

boundaries" of New Hampshire law.  Doyle v. Hasbro, Inc., 103
F.3d 186, 192 (1st Cir. 1996) (internal quotation marks omitted).

In Panto v. Moore Business Forms, 130 N.H. 730 (1988), the
New Hampshire Supreme Court ruled that, by distributing a "policy
statement" announcing that an employee's refusal to accept a job
reassignment under particular circumstances would be treated as a
lay-off entitling him to continuing fringe benefits, the employer
was making "an offer subject to an employee's acceptance, to be
expressed by the continued performance of his duties, upon which
an enforceable unilateral contract term will be formed."  Id. at
733-35.  The court rejected "the view that what an employer
chooses to call a policy statement is immune to the customary
rules of contract formation."  Id. at 739.  Provided those rules
are followed, the court held, the provisions of an employee
handbook can become the terms of an employment contract under New
Hampshire law.  Id. at 739-42.

Contrary to the plaintiffs' argument, then, New Hampshire
does not take a "liberal position" as to treating employee
handbooks as contracts:  when they satisfy the principles of
contract formation, they are contracts, and when they do not,
they are not.  See Smith v. F.W. Morse & Co., 76 F.3d 413, 426
(1st Cir. 1996) (reading Panto to hold that "[s]tandard contract
formation principles govern the creation and construction of such
contracts").  The plaintiffs make no effort to show how the

46

Stevens High student handbook satisfies these principles, i.e.,
that the handbook meets the legal requirements of an offer, that
Nicole properly manifested acceptance of any such offer, and that
Nicole tendered valid consideration.  "Offer, acceptance, and
consideration are essential to contract formation" under New
Hampshire law.  Tsiatsios v. Tsiatsios, 140 N.H. 173, 178 (1995).

     To take but one of these requirements, Nicole, like all
children under 16 (as she was at the time at the time she began
her sophomore year at Stevens, arguably marking her "acceptance"
of the terms "offered" by the handbook for that academic year)
was required by law "to attend the public school to which the
child is assigned in the child's resident district."  N.H. Rev.
Stat. Ann. § 193:1, 1.  Given the compulsory nature of Nicole's
attendance at Stevens, the handbook could not have been a valid
contract under "[t]he well-settled rule in the field of contracts
. . . that performance of a pre-existing legal duty . . . is not
valid consideration."  In re Lloyd, Carr & Co., 617 F.2d 882, 890
(1st Cir. 1980) (citing Restatement (First) of Contracts § 76(a)
(1932) among other authorities).  New Hampshire follows this
rule.  See Watkins & Son v. Carrig, 91 N.H. 459, 461 (1941);
Eleftherion v. Great Falls Mfg. Co., 84 N.H. 32 (1929).  So,
unlike the employee's continued employment after receiving the
policy statement in Panto, Nicole's attendance, or continued

attendance, at Stevens could not have furnished the consideration necessary to make the handbook a contract.

This fact alone distinguishes this case from the law in the court of appeals, on which the plaintiffs rely, holding that "[a] student's relationship to his university is based in contract" and that "[t]he relevant terms of the contractual relationship . . . typically include language found in the university's student handbook." Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007) (citing Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)). As Mangla notes, 135 F.3d at 83, this holding itself derives from the decision by the court of appeals in Lyons v. Salve Regina College, 565 F.2d 200, 202 (1st Cir. 1977). Lyons, applying Rhode Island law, observed the lack of precedent from that state's supreme court "resolving a dispute arising out of the relationship between a private academic institution and its students," but concluded that Rhode Island "would adopt, in construing the language of a claimed contract between a student and her college or university," id. (emphasis added), an approach using "'some elements of the law of contracts,'" though not "'rigidly . . . in all its aspects,'" id. (quoting Slaughter v. Brigham Young Univ., 514 F.2d 622, 626 (10th Cir. 1975)).

As the emphasized language suggests, Lyons did not consider the nature of the relationship between a public secondary school and its students, who, unlike their post-secondary counterparts,

48

do not decide to attend a particular institution in an act that
could in theory be deemed acceptance of the terms of its student
handbook and (together with their tuition) consideration for the
institution's promise to adhere to those terms.  Neither <u>Lyons</u>
nor any of the subsequent court of appeals decisions following
it, in fact, appears to have been applied in the case of a public
secondary school.  Furthermore, at least one court has
specifically declined to extend that line of authority into such
schools.  <u>Zellman ex rel. M.Z. v. Indep. Sch. Dist. No. 2758</u>, 594
N.W.2d 216, 219 (Minn. Ct. App. 1999).

    Indeed, the weight of authority holds that no contract
arises between a public secondary or elementary school and its
students as a result of its student handbook, reasoning that the
law of contracts--premised on the notion that voluntary
agreements should be enforced according to their terms--is an ill
fit for the compulsory nature of public education.  <u>See</u>
<u>Higginbottom ex rel. Davis v. Keithley</u>, 103 F. Supp. 2d 1075,
1080-81 (S.D. Ind. 1999); <u>Achman v. Chisago Lakes Indep. Sch.</u>
<u>Dist. No. 2144</u>, 45 F. Supp. 2d 664, 670 (D. Minn. 1999); <u>Zellman</u>,
594 N.W.2d at 219-220; 3 James A. Rapp, <u>Education Law</u> § 8.01[2]
[d][ii], at 8-19 (2008).[22]  This court believes that the New

_____

    [22]While the plaintiffs' superficial attacks on these cases
are unconvincing, they do advance one argument of some substance:
that the decision in <u>Higgbottom</u> relied on that court's view that
Indiana was "resolute in refusing to construe employee handbooks
or guides as a source of contractual rights."  103 F. Supp. 2d at

Hampshire Supreme Court would follow these cases, based on its

holding in <u>Panto</u> that an employee handbook is a contract only if

it passes the test for contract formation.[23]  Because the Stevens

handbook does not, it is not a contract as a matter of law, and

the District is entitled to summary judgment on the breach of

contract claim.


**2.   Discretionary function immunity**

The District and Couture move for summary judgment on the

plaintiffs' negligence and breach of fiduciary duty claims on the

basis of discretionary function immunity.  In New Hampshire, the

doctrine of discretionary function immunity is a judicially

created exception to ordinary rules of tort liability, shielding

a municipality's "acts and omissions constituting (a) the

exercise of a legislative or judicial function, and (b) the

exercise of an executive or planning function involving the

--------------------

1080.  But that was only part of the court's analysis; it also
reasoned that "the compulsory nature of public elementary
education, which requires public schools to accept enrollment of
children in their districts and mandates student attendance,
militates against importation of mutual assent and consideration
principles into the public elementary school context."  <u>Id.</u> at
1081.  It is that reasoning which this court believes would be
compelling to the New Hampshire Supreme Court.

[23]The only authority the plaintiffs offer to the contrary,
<u>T.E. v. Linn-Mar Cmty. Sch. Dist.</u>, No. 35077, 2000 WL 34514000
(Iowa Dist. Ct. Aug. 30, 2000), did not discuss or even decide
whether a public high school's student handbook could be a
contract as a matter of law, but simply assumed that it was.  <u>Id.</u>
at *3-*4.

making of a basic policy decision which is characterized by the high degree of official judgment or discretion." Merrill v. City of Manchester, 114 N.H. 722, 729 (1974).

In applying the doctrine, then, the New Hampshire Supreme Court "distinguish[es] between 'policy decisions involving the consideration of competing economic, social, and political factors' and 'operational or ministerial decisions required to implement the policy decisions.'" Everitt v. Gen. Elec. Co., 156 N.H. 202, 211 (2007) (quoting Mahan v. N.H. Dep't of Admin. Servs., 141 N.H. 747, 749-50 (1997)). That court, however, has "declined to draw a bright line between discretionary planning and the ministerial implementation of plans," Mahan, 141 N.H. at 749, generally considering on a case-by-case basis whether "[s]ubjecting [a municipality] to potential negligence liability in response to [its] decision would be tantamount to judicial interference with legislative or executive decision making" and therefore upset the separation of powers. Tarbell Adm'r, Inc. v. City of Concord, 157 N.H. 678, 684-85 (2008).

The District and Couture maintain that all of their allegedly tortious conduct amounts to "the exercise of an executive or planning function" covered by discretionary function immunity. This argument relies principally on the New Hampshire Supreme Court's decision in Hacking v. Town of Belmont, 143 N.H. 546 (1999), which applied the doctrine to certain negligence

51

claims against a town and school district for the plaintiff's injury during a school basketball game.  The plaintiff alleged multiple theories of negligence, including "that the defendants failed to train and supervise properly their employees, coaches, instructors, and referees to conduct the game."  Id. at 548.  The court ruled that discretionary function immunity barred this claim, reasoning that not only the defendants' decision to have the basketball program, but also their "decisions regarding what training and supervision to provide those whom the defendants chose to run the program," were "planning decisions requiring a high degree of discretion."  Id. at 550.  But the court declined "to address whether the selection of the referees or coaches was entitled to immunity" because that conduct had not been alleged as a basis for liability.  Id. at 551.

As this analysis suggests, applying discretionary function immunity depends on whether "'the particular conduct which caused the injury is . . . characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning.'" Everitt (quoting Gardner v. City of Concord, 137 N.H. 253, 257 (1993)) (emphasis added).  Here, as noted above, the plaintiffs allege that the District was negligent through a number of acts and omissions:  in failing to follow the Stevens sexual harassment policy, "to protect [Nicole] from abuse," to properly

52

train and supervise its staff, and to "warn Plaintiff of Grumman's propensities," as well as in hiring and retaining Grumman.  The plaintiffs also claim that the District breached its fiduciary duty to Nicole "by facilitating the abuse inflicted on her and by failing to keep her safe from its employees."[24] Discretionary function immunity shields the District from liability for most, but not all, of this conduct.

### a.   Negligent training and supervision (Count 8)

Hacking itself makes clear that the doctrine bars the plaintiffs' state-law tort claims insofar as they are based on the allegedly negligent failure to train or supervise Grumman or

----

[24]As discussed at oral argument, New Hampshire does not appear to treat the relationship between a public secondary school and its students as fiduciary in nature, characterizing it instead as "a special relationship" that gives rise to a duty enforceable in negligence (and treating the school as an ordinary employer subject to theories of negligent hiring or retention). Marquay v. Eno, 139 N.H. 708, 716-20 (1995).  While the New Hampshire Supreme Court subsequently held that "[i]n the context of sexual harassment by faculty members, the relationship between a post-secondary institution and its students is a fiduciary one," Schneider v. Plymouth State Coll., 144 N.H. 458, 462 (1999) (emphasis added), the court explained that this holding did not rely on the "special relationship . . . between primary and secondary schools and their students" recognized in Marquay, id. at 463 ("our conclusion that a fiduciary relationship existed between the [college] and the [student] does not rest on the in loco parentis doctrine").  But this court need not decide whether, despite the fairly clear indication to the contrary in Schneider, New Hampshire recognizes a fiduciary relationship between a public secondary school and its students, because the plaintiffs' fiduciary duty claim arises from alleged omissions that are protected by discretionary function immunity.  See infra Part III.B.2.c.

other Stevens personnel.  Given the ruling there that a school district's decisions on the appropriate training and supervision for elementary school coaches and referees involve the requisite degree of discretion to trigger the immunity, it follows here that a school district's decisions on the appropriate training and supervision of high school teachers and administrators are likewise shielded.  See also Jacobson v. City of Nashua, 2002 DNH 120, 18-19 (ruling that discretionary function immunity barred a negligence claim arising out of a city's alleged failure "to supervise, control, monitor and train" police officers).

### b.    Negligent hiring and retention (Count 7)

The same reasoning would extend New Hampshire's doctrine of discretionary function immunity to a municipality's decisions in hiring, firing, retaining, and disciplining its employees, even though Hacking did not ultimately reach that question.  As the court of appeals has observed, in ruling that discretionary function immunity barred a city's liability for its negligent hiring of a police officer under Massachusetts law,

> hiring decisions are susceptible to and involve policy
> analysis.  An entity must weigh budgetary constraints,
> public perception, and economic conditions in
> determining the number of hires as well as who [sic] to
> hire.  In addition, the choice between several
> potential employees involves the weighing of individual
> backgrounds, office diversity, experience, and employer
> intuition.

Crete v. City of Lowell, 418 F.3d 54, 65 (1st Cir. 2005)
(footnote and internal quotation marks omitted).

As the court of appeals also observed in Crete, other
federal courts of appeals have relied on such reasoning in
applying discretionary immunity not only to hiring functions, but
to decisions on employee discipline and termination as well.   Id.
at 64 (citing, among other authorities, Vickers v. United States,
228 F.3d 944, 950-51 (9th Cir. 2000) (applying immunity to
retention claim); Richman v. Straley, 48 F.3d 1139, 1146 (10th
Cir. 1995) (applying immunity to termination claim)).   Surveying
this authority, in fact, the court of appeals concluded that
"uniformly the federal circuit courts under the FTCA have found
that employer decisions such as hiring, discipline, and
termination of employees are within the discretionary function
exception."[25]   Id.

---

[25]In a statutory codification of discretionary function
immunity, the FTCA (Federal Tort Claims Act) bars otherwise
cognizable claims against the federal government "based upon the
exercise or performance or the failure to exercise or perform a
discretionary function or duty on the part of [a] federal agency
or an employee of the Government."  28 U.S.C. § 2680(a).  New
Hampshire's statutory codification of the immunity, as it applies
to the state and its agencies, contains nearly identical wording,
N.H. Rev. Stat. Ann. § 541:B-19, I(c), which the New Hampshire
Supreme Court has given the same breadth as the common-law
version of the doctrine applicable to municipalities.  See, e.g.,
Mahan, 141 N.H. at 749.  It follows that the New Hampshire
Supreme Court would find decisions applying the FTCA's
discretionary function immunity clause instructive in applying
the court's judicially created version.

Furthermore, as the District points out, the overwhelming majority of courts have ruled that state-law discretionary function immunity bars claims based on the hiring, retention, or discipline of public employees, including teachers and other school personnel.  See, e.g., Larson ex rel. Larson v. Miller, 76 F.3d 1446, 1457 (8th Cir. 1996) (en banc) (applying Nebraska law); Benedix v. Indep. Sch. Dist. No. I-007, 2009 WL 975145, at *3-*4 (W.D. Okla. Apr. 9, 2009); Moore v. Bd. of Educ., 300 F. Supp. 2d 641, 644 (N.D. Ill. 2004); Nance ex rel. Nance v. Matthews, 622 So. 2d 297, 301-02 (Ala. 1993); Jarrett v. Butts, 379 S.E.2d 583, 586 (Ga. Ct. App. 1989); Willoughby v. Lerbass, 388 N.W.2d 688, 700 (Mich. Ct. App. 1986); see also Crete, 418 F.3d at 65 ("most states also consider claims of negligent hiring to be barred by the discretionary function exception").  Most of these cases, like this one, involved claims against a school or its officials for an employee's abuse or other misconduct toward a student.  See Larson, 76 F.3d at 1451; Moore, 300 F. Supp. 2d at 643 & n.2; Jarrett, 379 S.E.2d at 584-85; Willoughby, 388 N.W.2d at 691.

Against this great weight of authority, the plaintiffs rely on a single case, Doe v. Cedar Rapids Community School District, 652 N.W.2d 439 (Iowa 2002), for the proposition that "[t]he choice to hire, retain, and supervise a particular teacher does not involve policy decisions entitled to protection from judicial

56

review." Id. at 445 (emphasis added).  There, the Iowa Supreme
Court reasoned that "[t]he administrative act of hiring,
retaining, and supervising an individual teacher does not involve
the careful balancing of competing interests, risks, and
advantages," calling it "no different than a government
employee's decision to turn left or right at a stop sign."  Id.
The court also relied on the defendant's failure to "articulate
any policies at the heart of [its] decision to hire" the teacher
in question, pointing out that "[t]he burden is on the School to
prove its actions are entitled to the shield of discretionary
function immunity."  Id. at 446 (citing 18 Eugene McQuillin, The
Law of Municipal Corporations § 53.04.20, at 162 (3d ed. 1993)).

     Whatever else may be said of the Iowa Supreme Court's
decision in Doe, it is plainly at odds with the decisions of the
New Hampshire Supreme Court in Hacking and the court of appeals
in Crete in both reasoning and result.  The Hacking court simply
recognized, without any particular showing by the defendants,
that "decisions regarding what training and supervision to
provide . . . necessarily involve the most prudent allocation of
municipal resources, and thus the weighing of competing economic,
social, and political factors."  143 N.H. at 550 (internal
quotation marks omitted).  So that court appears to share neither
its Iowa counterpart's view that a governmental defendant must
justify the decision at issue as a policy matter in order to

trigger discretionary function immunity, nor its view that individual personnel choices (at least insofar as they involve supervision or training) are so devoid of policy considerations as to render the doctrine generally inapplicable.

Indeed, the Hacking court cited approvingly to a number of decisions by other courts applying discretionary function immunity to claims for the negligent training and supervision of an individual employee, including Phillips v. Thomas, 555 So.2d 81, 85 (Ala. 1989), and Miller v. Szelenyi, 546 A.2d 1013, 1021 (Me. 1988). Miller specifically ruled, in fact, that the doctrine immunized a state hospital supervisor's decision to retain a doctor despite a complaint about his treatment of a patient, 546 A.2d at 1022--unquestionably a decision about "an individual" employee and, moreover, strikingly similar to the District's complained-of actions in this case.  To like effect is Crete, where the court of appeals applied state-law discretionary function immunity to a claim for the negligent hiring of a particular police officer, reasoning, as just discussed, that even an individual personnel decision implicates the policy considerations essential to the doctrine.  418 F.3d at 65.  Crete criticized the Iowa Supreme Court's decision in Doe as "a radical

departure from the law of other states" without considering the case any further.[26]  418 F.3d at 66.

The plaintiffs offer nothing to suggest that the New Hampshire Supreme Court would join the Iowa Supreme Court's "radical departure" from settled law in holding that discretionary function immunity does not apply to individual personnel decisions.  This court predicts that the New Hampshire Supreme Court would hold, like almost every other court to consider the question, that discretionary function immunity shields personnel decisions such as hiring, firing, retention, and discipline, regardless of whether any such decision involves just one employee.  Discretionary function immunity, then, bars the plaintiffs' claims insofar as they arise out of the District's hiring, retention, or discipline of Grumman.[27]

---

[26]Indeed, the very municipal law treatise on which the Doe court relied recognizes--contrary to the decision itself--that "[h]iring decisions are generally deemed discretionary." 18 McQuillin, supra, § 53.22.10 (footnote omitted).

[27]It is worth noting that, though the District has not challenged the plaintiffs' proof on this point, the record contains no evidence to support their claim that the District was negligent in hiring Grumman--which occurred some twenty-five years before his harassment of Nicole, and nearly twenty years before any documented complaint against him.

**c.    Breach of fiduciary duty (Count 3) and failure "to protect" and "to warn" (Counts 6 and 9)**

By much the same reasoning, discretionary function immunity also bars the plaintiffs' claims against the District for negligence in failing "to protect [Nicole] from abuse by the School District's employees" and "to warn Plaintiff of Grumman's propensities," as well as their parallel claim that the District breached its fiduciary duty to her "by facilitating the abuse inflicted on her and by failing to keep her safe from its employees."[28]   While the plaintiffs, in pleading these claims, do not identify the District's omissions with any greater particularity, their complaint elsewhere alleges that the District failed in not "reassigning [Grumman] to a position that

---

[28]The complaint alleges that the District owed Nicole a fiduciary duty "to act in good faith and due regard for her interests, to adopt and enforce practices to minimize the danger that students would be exposed to sexual harassment and abuse, to undertake measures to create, communicate and implement a well-designed grievance procedure to effectively deal with teacher misconduct, to provide an accessible and fair forum for student complaints, and to promote and create an environment in which sexual harassment is not tolerated."  Putting aside the fact that the complaint does not specifically allege any breach of this broadly asserted duty, the omission at the heart of this allegation--that, apart from its alleged failure to follow it in response to Nicole's complaint, the District failed to have an appropriate sexual harassment policy in the first place--is protected by discretionary function immunity.  See Mahan, 141 N.H. at 751 (noting that a decision on whether to impose rules, and what rules to impose, requires "an evaluation of the policy in favor of safety and the proper allocation of economic and human resources" protected as a discretionary function).

eliminated his contact with young girls or placing him on administrative leave while an investigation was undertaken."

When asked at oral argument to specify what should have been done to protect or to warn Nicole, the plaintiffs likewise suggested that the District should have:  removed Grumman from teaching, or at least from teaching girls; forced him to undergo sexual harassment training; offered education to students on how to identify and respond to teacher harassment; or provided warnings to girls at Stevens about Grumman in particular.

Discretionary function immunity covers each of these claimed omissions.  First, as just discussed at length, the doctrine applies to a municipality's decisions on disciplining or training its employees, including a particular employee.  <u>See</u> Part III.B.2.b, <u>supra</u>.  Second, and relatedly, the doctrine also applies to decisions on "what training . . . to provide" students, because, again, such "decisions necessarily involve the most prudent allocation of municipal resources, and thus the weighing of competing economic, social, and political factors." <u>Hacking</u>, 143 N.H. at 550 (internal quotation marks omitted).

Third, in line with the substantial case law applying discretionary function immunity to matters of employee discipline, courts have ruled that the doctrine shields a school's communications toward that end.  <u>See</u> <u>Jones v. Houston Indep. Sch. Dist.</u>, 979 F.2d 1004, 1007 (5th Cir. 1992)

61

(circulating a memo regarding a teacher's unfitness for employment); Upshaw v. Alvin Indep. Sch. Dist., 31 F. Supp. 2d 553, 559 (S.D. Tex. 1999) (telling a parent that a teacher had been fired). So the doctrine encompasses the plaintiffs' unusual theory that the District should have resorted to warning its students "of Grumman's propensities," because this could not have been accomplished without implicating the same policy considerations at play in other kinds of personnel decisions. See Part III.B.2.b, supra. Discretionary function immunity thus bars the plaintiffs' "failure to warn" and "failure to protect claims" insofar as they arise out of any of the omissions the plaintiffs have identified in support of those claims.

### d.    Failure to follow the harassment policy (Counts 4-5)

Discretionary function immunity, however, does not extend to the plaintiffs' claims that the defendants were negligent in failing to adhere to the Stevens sexual harassment policy in response to Nicole's complaint. Notwithstanding the doctrine, "[a] municipality may be subject to tort liability when workers negligently follow or fail to follow an established plan or standards, and injuries result." Schoff v. City of Somersworth, 137 N.H. 583, 590 (1993) (internal quotation marks omitted). This rule follows from the widely accepted notion that "conduct cannot be discretionary unless it involves an element of choice.

Thus, the discretionary function exception will not apply when a
. . . policy specifically prescribes a course of action for an
employee to follow.  In this event, the employee has no rightful
option but to adhere to the directive." <u>Berkovitz ex rel.</u>
<u>Berkovitz v. United States</u>, 486 U.S. 531, 536 (1988) (citation
omitted).

     Here, as the District and Couture have more or less
acknowledged, the Stevens sexual harassment policy expressly
deprived him, as principal, of the discretion to screen or
investigate a sexual harassment complaint on his own, mandating
instead that he immediately refer such a complaint to the
superintendent.  Because the policy "specifically prescribe[d] a
course of action for [Couture] to follow," <u>id.</u>, discretionary
function immunity does not protect his allegedly negligent
failure to follow it, either individually or on behalf of the
District as its agent.  <u>See</u> <u>Schoff</u>, 137 N.H. at 590.

     While, again, the District argues that Couture reasonably
believed that Nicole was not complaining about sexual harassment
within the meaning of the policy, that argument goes to whether
Couture's decision was negligent, not whether it is protected by
discretionary function immunity; indeed, as discussed <u>supra</u> at
Part III.A.2, the District has essentially conceded, both through
its interactions with the Brodeurs prior to the commencement of
this suit and the deposition testimony of its employees

thereafter, that the decision was not Couture's to make.  This admitted lack of discretion renders discretionary function immunity inapplicable to the plaintiffs' negligence claims insofar as they complain of a failure to follow the sexual harassment policy.[29]  See Kan. State Bank & Trust Co. v. Specialized Transp. Servs., Inc., 819 P.2d 587, 600-01 (Kan. 1991) (ruling that a school's failure to follow its own reporting policy was not a discretionary function); A v. Coffee County Bd. of Educ., 852 S.W.2d 899, 909 (Tenn. Ct. App. 1992) (similar); cf. Does 1-4 v. Covington County Sch. Bd., 969 F. Supp. 1264, 1286 (M.D. Ala. 1997) (assuming that a principal had a non-discretionary duty to respond to complaints under the school's Title IX policy, but finding that he did so).

## 3.    Recovery for emotional distress

The defendants also argue that the plaintiffs cannot recover under New Hampshire law for their claimed emotional distress. First, the defendants say, the evidence of their actions does not

---

[29]The complaint pleads Count 4, alleging a negligent failure "to enforce the rules contained in the Handbook," against all defendants, which would include Grumman individually.  The plaintiffs do not argue, however, that Grumman was negligent in violating the sexual harassment policy; instead, as discussed infra at Part III.B.3.b, they argue that he did so intentionally, which is also what they allege in the body of their complaint. The plaintiffs have therefore essentially abandoned any negligence claim against Grumman individually, if they even pled one in the first place.  See Caouette v. OfficeMax, Inc., 352 F. Supp. 2d 134, 140 (D.N.H. 2005).

establish intentional infliction of emotional distress as a
matter of law.  Second, the defendants argue, the plaintiffs lack
the expert testimony required in New Hampshire to establish both
the physical manifestations of their claimed emotional distress
and its link to the defendants' actions, and that, in any event,
Nicole's parents cannot recover in negligent infliction of
emotional distress for what happened to her.

### a.    Intentional infliction of emotional distress (count 11)

"One who by extreme and outrageous conduct intentionally or
recklessly causes severe emotional distress to another is subject
to liability for such emotional distress."  Mikell v. Sch. Admin.
Unit No. 33, ___ N.H. ___, 2009 WL 1352408, at *3 (N.H. May 15,
2009).  In Mikell, the New Hampshire Supreme Court recently
reaffirmed the formidable standard of "extreme and outrageous
conduct" necessary to impose such liability:

> it is not enough that a person has 'acted with an
> intent which is tortious or even criminal, or that he
> has intended to inflict emotional distress, or even
> that his conduct has been characterized by "malice."
> Liability has been found only where the conduct has
> been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency,
> and to be regarded as atrocious, and utterly
> intolerable in a civilized community.'

Id. (quoting Restatement (Second) of Torts § 46 cmt. d, at 73
(1965)).  "It is for the court to determine, in the first
instance, whether the defendant's conduct may reasonably be

regarded as so extreme and so outrageous as to permit recovery"
for intentional infliction of emotional distress as a matter of
law.  Restatement (Second) of Torts § 46 cmt. *h*, at 77 (1965)).

     The court agrees with the defendants that their behavior
toward the plaintiffs was insufficiently "extreme and outrageous"
to support such a claim.  Though a jury could conclude that
Couture's (or, ultimately, the District's) response to Nicole's
complaint about Grumman's behavior manifested deliberate
indifference, despite the stringency of that standard, see Part
III.A.2, supra, the test for intentional infliction of emotional
distress is even higher, as just discussed.  "Except in
extraordinary circumstances, a party's failure to respond to
complaints does not rise to the level of intentional infliction
of emotional distress."  Bowers v. Concord Opthamologic Assocs.,
PA, 2003 DNH 219, 6-7 (citing cases).[30]

     While, again, Couture's and the District's actions could be
found clearly unreasonable, they were not extraordinarily so as
to go beyond all possible bounds of decency and to be utterly
intolerable in a civilized community.  See Doe v. Town of Bourne,

---

     [30]In Bowers, in fact, this court dismissed a medical
technician's intentional infliction of emotional distress claim
arising out of the defendant physicians' "alleged failure and
refusal to intervene," 2003 DNH 219, 6, in their partner's
gender-based "intentional verbal abuse" of the plaintiff, which
included calling her names and belittling and demeaning her in
the presence of patients, fellow staff members, and other doctors
in the practice," id. at 3.

No. 02-11363, 2004 WL 1212075, at *12-*13 (D. Mass. May 8, 2004)
(ruling that school's failure to inform plaintiff's parents or
the police, or to conduct its own investigation, in response to
learning that plaintiff had been raped by another student in the
school bathroom was insufficiently extreme and outrageous to
support an intentional infliction of emotional distress claim).

　　Grumman's conduct toward Nicole lends itself to much the
same analysis:  though, as this court has ruled, a jury could
find Grumman's comments "severe, pervasive, and objectively
offensive" so as to amount to actionable harassment under Title
IX, see Part III.A.3, supra, that too is a lower standard than
necessary to prevail on a claim for intentional infliction of
emotional distress.  See Konefal v. Hollis/Brookline Co-op. Sch.
Dist., 143 N.H. 256, 261 (1998) (noting that "outrageous conduct"
contemplates "a great deal more" than simply "illegal and
reprehensible conduct") (internal quotation marks omitted).
Indeed, in most cases where courts have found a teacher's gender-
motivated conduct toward a student sufficiently extreme and
outrageous to support such a claim, it included physical abuse.
See, e.g., Doe v. D'Agostino, 367 F. Supp. 2d 157, 173 (D. Mass.
2005); Hackett v. Fulton County Sch. Dist., 238 F. Supp. 2d 1330,
1372 (N.D. Ga. 2002); Doe v. Beaumont I.S.D., 8 F. Supp. 2d 596,
602, 615 (E.D. Tex. 1998); Bustos v. Ill. Inst. of Cosmetology,
No. 93-5980, 1994 WL 710830, at *5 (N.D. Ill. Dec. 15, 1994).

To like effect is the case on which the plaintiffs principally rely, Duguay v. Androscoggin Valley Hospital, No. 95-112, 1996 WL 157191 (D.N.H. Jan. 25, 1996).  There, this court ruled that a female employee's allegations that her male supervisor "offensively touched her such as by blowing into her ear and pulling on her clothes," as well as that he "habitually, repeatedly, and intentionally subjected her to sexually suggestive, demeaning, and inappropriate statements," was sufficient--though just "[a]rguably"--to state a claim for intentional infliction of emotional distress.  Id. at *5 (internal quotation marks, bracketing, and ellipse omitted); see also Graham v. Nadeau, No. 2008 U.S. Dist. LEXIS 35967, at *22-*23 (D.N.H. Apr. 15, 2008) (ruling that male inmate's complaint of "malicious strip searches," including placing him without clothing in a holding tank in view of women and children for three hours, "alleged the minimum facts necessary to state a claim for intentional infliction of emotional distress"), rept. & rec. adopted, 2008 U.S. Dist. LEXIS 49854 (D.N.H. June 30, 2008).

This is not to say that a student cannot prevail on such a claim as a matter of law if it arises from a teacher's words rather than his actions.  As the plaintiffs point out, New Hampshire recognizes that "'[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position . . . which gives him actual or apparent authority

68

over the other, or power to affect his interests,'" such as the
student-teacher relationship.  Mikell, 2009 WL 1352408, at *3
(quoting Restatement (Second) of Torts § 46 cmt. *e*, at 74).  But,
as Mikell cautions, it does not follow that any verbal harassment
by a teacher, "even coupled with [his] position of authority,
rises to the level of extreme and outrageous conduct necessary to
sustain a claim for intentional infliction of emotional
distress."  Id.  Instead, the nature of the harassment must
transcend the "unprofessional and confrontational," and even the
"reprehensible," exceeding "all possible bounds of decency."  Id.
at *4 (internal quotation marks omitted).

        Grumman's comments to Nicole were unquestionably
unprofessional, and arguably reprehensible, but not beyond "all
possible bounds of decency," even for an older man in a position
of authority as a teacher to adolescent girls.  See Niles v.
Nelson, 72 F. Supp. 2d 13, 23 (N.D.N.Y. 1999) (finding that a
male teacher's classroom commentary, which included joining in
the male students' "inappropriate sexual comments" about the
fourteen year old female plaintiff, was "puerile behavior
entirely inappropriate for a teacher" but did "not rise to the
level of extreme and outrageous such that it goes beyond all
possible bounds of decency and is utterly intolerable in a
civilized society").  As the court of appeals has observed,
"[t]he standard for making a claim of intentional infliction of

emotional distress is very high" in New Hampshire.  <u>Moss v. Camp Pemigewassett, Inc.</u>, 312 F.3d 503, 511 (1st Cir. 2002).  The defendants' conduct was insufficiently extreme and outrageous to support the plaintiffs' intentional infliction of emotional distress claim as a matter of law.[31]

### b.   Negligent infliction of emotional distress (Count 10)

In addition to their many negligence theories, discussed in Part III.B.2, <u>supra</u>, the plaintiffs have also brought a stand-alone claim for negligent infliction of emotional distress.  As an initial matter, insofar as Nicole's parents assert their own claim for negligent infliction of emotional distress based on the defendants' treatment of Nicole, that claim fails.  Any such distress on the parents' part is not "directly attributable to the emotional impact of [their] observation or contemporaneous sensory perception of" the defendants' conduct, as required for parents to recover for emotional distress from their children's injuries under New Hampshire law.  <u>Corso v. Merrill</u>, 119 N.H. 647, 656 (1979).  The plaintiffs' summary judgment objection does not even address the defendants' argument on this point.[32]

---

[31]It should be noted that the record contains no evidence even remotely suggesting that Nicole's parents experienced "severe emotional distress," which independently dooms their intentional infliction claim.  <u>See</u> <u>Konefal</u>, 143 N.H. at 261.

[32]Insofar as Nicole's parents join in any of the other negligence claims--the complaint is unclear on this point--those

The defendants also argue that Nicole cannot recover for negligent infliction of emotional distress, or emotional distress as an element of her damages under any other negligence theory, because she lacks the requisite expert testimony establishing the physical manifestations of that distress and its link to the defendants' conduct.  "To ensure that the emotional injury is sufficiently serious to be afforded legal protection as well as to establish causation," the New Hampshire Supreme Court has "repeatedly held that 'expert testimony is required to prove physical symptoms suffered from alleged negligent infliction of emotional distress,'" including when a plaintiff seeks "[t]o recover for emotional distress under a traditional negligence theory."[33]  O'Donnell v. HCA Health Services of N.H., Inc., 152

---

claims also fail because the defendants owed their duty of care to her, see Marquay, 139 N.H. at 716-20, not to her parents, see, e.g., Turner ex rel. Turner v. N. Panola Sch. Dist., No. 06-0098, 2007 WL 2359773, at *4 (N.D. Miss. Aug. 14, 2007); Jachetta v. Warden Jt. Consol. Sch. Dist., 176 P.3d 545, 548 (Wash. Ct. App. 2008).  Nor, for that matter, can the parents assert their own claim under Title IX.  See Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006, 1009 n.4 (5th Cir. 1996), overruled on other grounds by Davis, 526 U.S. 629; Zamora v. N. Salem Cent. Sch. Dist., 414 F. Supp. 2d 418, 427 (S.D.N.Y. 2006).  This does not necessarily mean, however, that Nicole's parents cannot recover for the private school tuition they paid on her behalf, assuming they can prove the necessary causal link to the defendants' misconduct and overcome the other potential obstacles to that recovery.  A decision on that point, if necessary, awaits further briefing.  See note 11, supra.

[33]As the court noted at oral argument, this state-law rule does not restrict Nicole's potential recovery for emotional distress under Title IX.  See, e.g., Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 237 (1st Cir. 2006) (noting that "medical or

N.H. 608, 611-12 (2005) (quoting Silva v. Warden, N.H. State
Prison, 150 N.H. 372, 374 (2003)); see also, e.g., Palmer v. Nan
King Rest., Inc., 147 N.H. 681, 683-84 (2002); Thorpe v. New
Hampshire, 133 N.H. 299, 304 (1990).

The plaintiffs seek to avoid this rule here on a number of
grounds.  First, relying on this court's decision in Daroczi v.
Vermont Center for the Deaf & Hard of Hearing, Inc., 2004 DNH 027
(Muirhead, M.J.), they argue that, given the intentional nature
of Grumman's conduct, they are not subject to the expert witness
requirement, which applies only to claims for emotional distress
which is "negligently caused."  In Daroczi, this court ruled that
the plaintiff's lack of an expert witness did not prevent her
from recovering for emotional distress against her former
boarding school on theories that it had negligently hired,
retained, and supervised an employee who sexually harassed and
attempted to molest her.  Id. at 24-25.  The court found the rule
"that expert testimony is required 'in all negligence cases where
emotional distress damages are claimed,'" id. at 24 (quoting
Thorpe, 133 N.H. at 304), not to apply where a plaintiff "seeks
to hold the Defendant directly liable for injuries that she

---

other expert evidence is not required to prove emotional
distress" in a Title VII case (internal bracketing and quotation
marks omitted)), cert. denied, 549 U.S. 1279 (2007).  Again,
Title IX and Title VII are generally interpreted the same way.
See note 19, supra.

suffered as a result of Defendant's employee's intentionally tortious conduct," id. at 25.

Since Daroczi, however, the New Hampshire Supreme Court has clarified that no expert witness is necessary to recover for emotional distress only if it arises "from direct physical injury and/or intentional torts." O'Donnell, 152 N.H. at 612 (internal quotation marks omitted).  To illustrate, the court cited three of its prior decisions, each of which permitted recovery for emotional distress, without an expert, on an intentional tort theory against the intentional tortfeasor himself.[34]  Id. (citing In re Gronvaldt, 150 N.H. 551, 554 (2004) (action against husband for divorce based on mental anguish caused by his physical and verbal abuse); Silva, 150 N.H. at 374-75 (action against prison guards for battery); Fischer v. Hooper, 143 N.H. 585, 592 (1999) (action against wiretapper for invasion of privacy)).  O'Donnell also expressly declined to expand the exception to the expert witness requirement beyond these cases, id., none of which involved a negligence theory against the defendant premised on a third party's intentionally tortious conduct.

---

[34]Whether New Hampshire requires expert testimony to recover for intentionally inflicted emotional distress, then, presents a different question.  Though Grumman raises the issue in his summary judgment motion, the court need not decide it, since the plaintiffs cannot sustain their intentional infliction of emotional distress claim as a matter of law.  See Part III.B.3.a, supra.  The plaintiffs' reliance on Silva for the proposition that no expert testimony is needed "when mental suffering results from an intentional tort" is therefore beside the point.

Thus, insofar as Daroczi holds that no expert testimony is necessary to recover for emotional distress in negligence--so long as the negligence contributed to cause a third party to perpetrate an intentionally tortious act against the plaintiff, which in turn caused the emotional distress--that holding has questionable validity in light of the state supreme court's subsequent decision in O'Donnell.  But even assuming, dubitante, that Daroczi remains an accurate statement of New Hampshire law, it does not assist the plaintiffs here anyway, in light of this court's ruling that discretionary function immunity bars all of their negligence theories arising out of Grumman's intentionally tortious conduct, i.e., his harassing comments toward Nicole. See Parts III.B.2.a-c, supra.

The only negligence claim left unscathed by discretionary function immunity is the claim that the District and Couture were negligent in failing to follow the Stevens sexual harassment policy in response to Nicole's complaint, see Part III.B.2.d, supra, and the plaintiffs have not argued that Grumman engaged in any intentionally tortious conduct as a result of that negligence, see note 7 and accompanying text, supra.  What they have alleged instead is that, due to the negligent failure to implement the policy, Grumman was allowed to continue teaching Nicole's class and at Stevens in general, and that his continued presence caused her emotional distress.  See note 20, supra.

That is a claim that seeks to hold the District and Couture
liable for an injury caused by their own negligence, not a claim
that "seeks to hold the Defendant directly liable for injuries
that she suffered as the result of Defendant's employee's
intentionally tortious conduct."  Daroczi, 2004 DNH 027, at 25.
So the exception recognized in Daroczi, even if still available
after O'Donnell, does not apply here.

Second, the plaintiffs argue that they need no expert
witness to testify to Nicole's emotional distress because those
"damages are of the 'generic kind,' that an ordinary person would
feel in such circumstances and therefore no expert is needed,"
relying on Desclos v. Southern New Hampshire Medical Center, 153
N.H. 607 (2006).  But that case held only that a plaintiff does
not impliedly waive the privilege protecting her
psychotherapeutic records simply by bringing "a damage claim for
'generic' mental suffering that is incident to the physical
injury" because such "suffering is in the jurors' common
experience and does not depend upon expert evidence."  Id. at 614
(emphasis added).  Desclos, then, simply applied the longstanding
rule that a plaintiff needs no expert testimony to recover for
emotional distress that accompanies physical injury negligently
caused by the defendant.[35]  See, e.g., Evans v. Taco Bell Corp.,

------

[35]Again, O'Donnell expressly declined to expand the
recognized exceptions to the rule requiring expert testimony to
recover for emotional distress in negligence.  152 N.H. at 612.

2005 DNH 132, 20-25 (extensively discussing New Hampshire law on this point).  Nicole, of course, alleges no physical injury arising from the defendants' negligence.

Third, the plaintiffs argue that they have whatever experts they need in the persons of the counselor Nicole spoke with in the spring and summer of 2006 and the therapist she saw once in March 2007, and regularly beginning in October of that year. There are at least three problems with this theory:  (1) the plaintiffs did not raise it until oral argument, which is too late, see, e.g., Doe v. Friendfinder Network, Inc., 540 F. Supp. 2d 288, 304 n.19 (D.N.H. 2008), (2) the summary judgment record contains no admissible evidence suggesting that these providers can testify as to any physical manifestations of Nicole's claimed distress or its link to the defendants' conduct, and (3) the plaintiffs failed to designate the providers as expert witnesses under Rule 26(a)(2)(A) by the deadline set forth in the court-approved discovery plan (in fact they have yet to designate them at all), which is required despite their status as treating professionals, see Aumand v. Dartmouth Hitchcock Med. Ctr., ___ F. Supp. 2d ___, 2009 DNH 061, 16-19.

The mere existence of a counselor or therapist who spoke to Nicole about her treatment by Grumman, then, does not suffice to provide the expert testimony necessary for her to recover for emotional distress, whether through her stand-alone negligent

infliction claim or her theory that Couture and the District
negligently failed to follow the policy.  The defendants are
therefore entitled to summary judgment on the former claim and,
unless Nicole or her parents can recover some other form of
damages on the latter claim, see note 11, supra, may be entitled
to summary judgment on that claim in its entirety as well.

## IV.  **Conclusion**

For the foregoing reasons, the defendants' motions for
summary judgment[36] are GRANTED as to counts 2-3 and 6-11, and are
DENIED as to counts 1, 4-5, and 12 (which alleges a respondeat
superior theory still available, for now, in light of this
court's ruling on Count 4).  The motions are also denied without
prejudice insofar as they challenge the plaintiffs' remaining
damages claims.  See note 11, supra.  Given this disposition,
Gene Grumman is TERMINATED as a defendant in this matter.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  June 12, 2009

cc:  Peter E. Hutchins, Esq.
     Donna-Marie Cote, Esq.
     Diane M. Gorrow, Esq.
     Corey M. Belobrow, Esq.

---

[36]Docket nos. 17 and 19.

77